UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HENRY PATRICK MCGHEE,

        Plaintiff,

vs.

HYBRID LOGISTICS, INC. and
CLEAVER-BROOKS, INC.,

        Defendants.
_____/

Case No: 12-10771

HON. AVERN COHN

**MEMORANDUM AND ORDER GRANTING DEFENDANT
CLEAVER-BROOKS, INC.'S MOTION FOR SUMMARY
JUDGMENT (Doc. 65) AND GRANTING DEFENDANT
HYBRID LOGISTICS, INC.'S MOTION FOR SUMMARY
JUDGMENT (Doc. 68) AND DISMISSING AS MOOT
CLEAVER-BROOKS, INC'S MOTION TO QUASH
SUBPOENA (Doc. 75) AND DISMISSING CASE**

## I. INTRODUCTION

This is a tort case invoking the Court's diversity jurisdiction under 28 U.S.C. § 1332. Henry Patrick McGhee ("McGhee") was severely injured, including a partial amputation of one of his legs, when a bundle of steel coils fell on him while he was working as a commercial truck driver for Black Warrior Trucking and Equipment, Inc. ("Black Warrior"), a licensed steel shipping company.[1] The injury occurred at Olympic Steel Winder's ("Olympic Steel")[2] Detroit facility when a crane operator employed by Olympic Steel loaded the steel coils onto McGhee's truck to be transported to Thomasville, Georgia. McGhee

---

[1] McGhee was actually employed by W&H Trucking, Inc. ("W&H"), an Alabama trucking company. W&H contracted McGhee to Black Warrior on an as needed basis for the last ten years of his employment.

[2] Olympic Steel is not a party to this action.

is suing Cleaver-Brooks, Inc. ("Cleaver-Brooks"), the purchaser of the steel coils, and Hybrid Logistics Inc. ("Hybrid"), a licensed freight broker hired by Olympic Steel who in turn hired Black Warrior to deliver the steel coils to Cleaver-Brooks.[3]

The first amended complaint (Doc. 21) is in three counts:

Count I      Negligence (Hybrid Logistics)

Count II     Negligence (Cleaver-Brooks)

Count III    Negligence (Cives Corporation)[4]

Now before the Court are three motions:

(1) Cleaver-Brooks's motion for summary judgment (Doc. 65);

(2) Hybrid's motion for summary judgment (Doc.68); and

(3) Cleaver-Brooks's motion to quash subpoena to non-party Thomson Reuters (Doc. 75).

For the reasons that follow, Cleaver-Brooks's motion for summary judgment is GRANTED, Hybrid's motion for summary judgment is GRANTED, and Cleaver-Brooks's motion to quash is DISMISSED AS MOOT. This case is DISMISSED.

---

[3] McGhee also sued Olympic Steel and its employees–the steel bander and crane operator. *See Henry Patrick McGhee v. Olympic Steel, Inc., et al.*, No. 09-015209-NP (Wayne County Circuit Court). *See also* (Doc. 66-2). The complaint in that case alleged negligence against all of the defendants. McGhee claimed that the steel was negligently placed on his truck and that the negligent placement of the steel proximately caused his injuries. (*Id.*). The case settled for approximately $6,000,000.00. In addition, the complaint in this action lists another lawsuit arising out of this incident: *Henry Patrick McGhee v. Olympic Steel, Inc., et al.*, No. 10-005557-NF (Wayne County Circuit Court). The complaint states that the second case also settled. The papers do not explain the details of the second case.

[4] In an earlier order, the Court dismissed the case against Cives Corporation. (Doc. 35) Count III was dismissed with a judgment entered in favor of Cives Corporation. (Doc. 36).

## II. BACKGROUND

On May 21, 2009, McGhee sustained serious injuries when steel coils were being loaded onto his flatbed trailer at Olympic Steel's facility in Detroit, Michigan. McGhee was working for Black Warrior, a federally licensed interstate motor carrier, to transport the steel coils from Detroit to Cleaver-Brooks in Thomasville, Georgia.

Cleaver-Brooks buys slit steel coils[5] that it manufactures into tubes to be used in boiler systems. Cleaver-Brooks has manufacturing and warehousing facilities in ten locations worldwide. Relevant to this case, Cleaver-Brooks contracted with Olympic Steel, a company operating out of Winder, Georgia, to purchase a truckload of steel–eight (8) pieces of Hot Rolled Pickled Dry Coil steel weighing 45,450 pounds. (Doc. 66-10).[6] Cleaver-Brooks's purchasing agent, Shirley Smith ("Smith"), issued a purchase order to Olympic Steel, Purchase Order T13729, setting a May 12, 2009 date of delivery. Because of issues related to obtaining the steel, the delivery date eventually changed to May 21, 2009.

The Purchase Order required the steel be shipped via "BEST WAY." (Doc. 93-2 at 2). After the Purchase Order was received, Olympic Steel prepared a Sales Order which states, in pertinent part:

****MUST SHIP IN RACKS****

EYE TO THE REAR FOR OHC [overhead crane] UNLOADING

---

[5] Slit steel coils are coils that have been cut from a large roll of steel into narrower rolls.

[6] Cleaver-Brooks had purchased steel from Olympic Steel on prior occasions. In 2008, Cleaver-Brooks entered into a requirements contract with Olympic Steel whereby Olympic Steel provided Cleaver-Brooks with all of its slit coil for a sixth month period. *See* (Doc. 85-2).

****TRUCK MUST BE ON SITE AT 7:00AM ****

(*Id.*).[7]

To fulfill Cleaver-Brooks's order, Olympic Steel purchased the steel coils from Voss Steel in Detroit, Michigan. Then, Olympic Steel moved the coils to its sister facility, Olympic Steel Southern, in Detroit.

After purchasing the steel from Voss Steel and moving it to Olympic Steel's Detroit facility, Olympic Steel arranged to have the steel shipped to Cleaver-Brooks in Thomasville to fulfill the contract. To this end, Olympic Steel hired Hybrid Logistics, a freight broker, to in turn hire a trucking company to ship the steel from Olympic Steel's Detroit facility to Cleaver-Brooks's Thomasville facility. Hybrid Logistics hired Black Warrior to ship the steel.

Hybrid Logistics and Black Warrior are parties to a brokerage contract dated October 21, 2008. Pursuant to that contract, Hybrid Logistics is the "Broker" and Black Warrior is the "Carrier." The contract states, in pertinent part,

> INDEPENDENT CONTRACTOR: It is understood and agreed that the relationship between BROKER and CARRIER is that of an independent contractor and that no employer/employee or agency relationship exist, or is intended. CARRIER is solely responsible for operating the equipment necessary to transport the freight under this Agreement. BROKER has no control over CARRIER, except to insist on strict compliance with the terms of this Agreement.

(Doc. 70-3 at 5).

---

[7] The phrase "eyes to the rear" is a term of art in the steel industry. The manner in which the steel coils are shipped affects the loading and unloading process. When steel coils are delivered with the "eyes to the rear," it means that they can be unloaded using an overhead crane to protect the coils from damage. Cleaver-Brooks's employee Joe McAuley ("McAuley") testified at his deposition that Cleaver-Brooks began requiring steel to be shipped this way in 2004 for safety reasons during the unloading process, and because it would prevent the steel coils from being damaged in transit. (Doc. 66-3 at 7).

4

Black Warrior assigned McGhee, a truck driver, to transport the steel coils from Detroit to Thomasville. McGhee had recently delivered a load of telephone poles from Tuscaloosa, Alabama to Ironton, Michigan on a separate assignment by Black Warrior. Black Warrior did not want McGhee to drive an empty truck back to Alabama; therefore, Black Warrior's dispatcher, Kristy Overton ("Overton"), contacted Hybrid Logistics to see if it had a lead on a shipment to go from Michigan to the south. Hybrid Logistics informed Overton that it was looking for someone to transport the steel coils from Detroit to Thomasville. Black Warrior sent McGhee.

On May 21, 2009, McGhee drove his truck to Olympic Steel's Detroit facility to pick up the steel coils for delivery. McGhee testified that when he arrived at Olympic Steel to pick up the coils, he was surprised to learn that the coils were going to be placed standing up in "coil blocks." McGhee thought that the coils were going to be placed flat on the truck. McGhee testified at his deposition that Zach Taylor ("Taylor") from Hybrid Logistics told him that the load of coils was going to be placed flat on the truck, not standing up. After confirming with Olympic Steel that he was picking up coils, not plates, McGhee pulled his truck into the loading area to prepare to load the steel coils onto the truck.[8]

A crane operator employed by Olympic Steel, Alex Kelesovski ("Kelesovski"), began loading the steel coils onto McGhee's truck, standing up, and without any racks. McGhee helped to "guide" the steel coils onto the truck while he was "standing back more or less kind of like in the center of the trailer." (Doc. 71-1 at 3). This required McGhee to touch the bundle of coil while it was on the crane's hook, moving it in the correct position onto the

---

[8] McGhee testified that, prior to continuing with the load, he called Overton to express his concern. She did not answer.

5

truck. The first two bundles, each consisting of three coils, were loaded using this process, with McGhee guiding the coils. The coils were placed on the truck with "eyes to the side"[9] and were separated by a space of several feet. As each bundle of coils was placed on the truck, Kelesovski would unhook the bundle from the crane. McGhee did not secure the first two bundles of coil with chains after they were unhooked from the crane because he did not believe that the bundles would tip over nor did he think that it was dangerous to leave the bundles of coil unchained. (Doc. 71-1 at 6). In addition, McGhee had not yet accepted the load for delivery. McGhee testified that he would have chained the bundles of coil to the truck if he thought there was a possibility that they would tip over. (*Id.*).

Before Kelesovski placed the last bundle of steel coils on the truck, McGhee walked around the truck to make sure that the first two bundles were properly on the truck. McGhee noticed that the first bundle of coils was slightly leaning. As McGhee testified at his deposition: "You could look and tell it wasn't standing directly with the first coil. It wasn't directly – it was leaning like that but just, basically, you could tell it was offset."(*Id.* at 7). McGhee went on to explain that the bundle of coils was leaning towards the passenger side of the truck. (*Id.* at 8).

McGhee signaled for Kelesovski to come back because he believed it was unsafe to have the bundle of coils leaning. (*Id.*). Eventually, Kelesovski made it back to the truck. McGhee said that Kelesovski lifted the first bundle of coils with the crane and reset it; McGhee helped guide the coils again. (*Id.*). After the first bundle of coils was repositioned,

---

[9] As McGhee explained at his deposition, when steel coils are loaded on a truck "eyes to the side," there is no block preventing the coil from falling left or right, from the passenger's side or the driver's side. (Doc. 65-5 at 5).

McGhee signaled for Kelesovski to get the third bundle. (*Id.* at 10).

Almost immediately after Kelesovski went to get the third bundle, McGhee heard the banding of the first bundle of coils break. (*Id.* at 10). McGhee does not recall if, at the time the banding broke, he had already set up the blocks of wood on the truck to prepare for the third bundle. (*Id.*). After hearing the banding break, the next thing McGhee recalls is that he was on the floor and his leg was gone. (*Id.*). The first bundle of coils had fallen off of the truck on the passenger side severely injuring McGhee's lower extremities.

McGhee says that the coils tipped over because Cleaver-Brooks required the steel to be placed in a particularly dangerous manner on the truck. There are two ways that Cleaver-Brooks accepts shipments of steel coils: (1) standing up on racks (a process Cleaver-Brooks has followed since 2004), see (Doc. 66-6 at 15); and (2) standing up without racks pursuant to particular "PDF" instructions, as will be explained below. Here, the steel coils were being placed on McGhee's truck without racks. There is disagreement over whether Cleaver-Brooks consented to the steel coils being shipped without racks. However, for purposes of summary judgment, the Court will view the evidence in a light most favorable to McGhee and assume that Cleaver-Brooks consented to delivery of the steel coils standing up without racks.[10]

Cleaver-Brooks has conceded, for purposes of summary judgment only, that Shirley

---

[10] Internal e-mail correspondence at Olympic Steel shows that someone at Olympic Steel contacted Shirley Smith at Cleaver-Brooks to obtain permission to ship the steel coils without racks, as long as specific "PDF" instructions–consisting of a diagram and pictures, see (Doc. 65-2)–for properly shipping the coils were followed. (Doc. 83-3). At her deposition, Smith denied ever speaking with anyone at Olympic Steel's Detroit facility or giving permission to ship the steel coils without racks or pursuant to the "PDF" instructions. (Doc. 66-9 at 6). Indeed, Smith testified that she did not even know that the steel was supposed to be delivered from Olympic Steel's Detroit facility. (*Id.*).

Smith from Cleaver-Brooks gave someone at Olympic Steel permission to ship the steel without racks pursuant to the "PDF" instructions contained in Doc. 65-2. The "PDF" instructions are explained by Cleaver-Brooks: The instruction "depicts eight steel coils standing up chained and bundled together as a single bundle, chained to the bed of a flatbed trailer, with the eye of the coils to the rear of the truck." (Doc. 94 at 17).

It is undisputed, however, that Kelesovski was not loading the bundles of steel coils onto McGhee's truck pursuant to the "PDF" instructions. As explained by Cleaver Brooks, the steel

> was being loaded as a bundle of three coils, a space of a few feet, another bundle of three coils, another space, and a bundle of two coils with the eyes to the side. The accident occurred during the loading process when none of the six coils located on the flatbed trailer were chained to the trailer.

(Doc. 65 at 9). The manner in which the coils were loaded is further described in Smith's affidavit:

> . . . as three (3) coils banded together, a space, then three (3) more coils banded together, a space, and two (2) coils banded together, all eyes to the side without racks.

(Doc. 66-5). Kelesovski testified at his deposition that he was not informed that the steel coils were to be shipped in any particular manner.

McGhee conceded during his deposition that the steel coils were not loaded pursuant to the "PDF" instructions, although he did not see the instructions on the day of the accident. *See* (Doc. 65-5 at 3–4).

Lastly the steel coils were not being loaded onto McGhee's truck pursuant to the Sales Order. The Sales Order required that the steel be loaded using racks with "eyes to the rear." The coils were being loaded without racks with "eyes to the side."

8

## III. LEGAL STANDARD

The standard for summary judgment is well known and is not repeated in detail. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV. DISCUSSION

### A. Negligence – Cleaver-Brooks

McGhee says that Cleaver-Brooks was negligent because it created a significant risk of harm to him by allowing the steel coils to be shipped by Olympic Steel in a dangerous manner: standing up without racks. McGhee is wrong.

#### 1. The Law – Negligence Generally

Under Michigan law,[11] "[t]o establish a prima facie case of negligence, a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke v. Ann Arbor Ceiling & Partition Co., L.L.C.*, 489 Mich. 157, 162 (2011) (citing *Roulo v. Auto Club of Mich.*, 386 Mich. 324, 328 (1971)).

#### 2. Cleaver-Brooks did not owe McGhee a legal duty

Cleaver-Brooks did not owe McGhee a legal duty. As the Sixth Circuit has

---

[11] In diversity cases such as here, this Court must apply the substantive law of Michigan as the forum state. *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607–08 (6th Cir. 2012) (citations omitted). If "the Michigan Supreme Court has not addressed the issue presented," the Court must "anticipate how [it] would rule in the case." *Id.* (citing *Allstate Ins. Co. v. Thrifty Rent–A–Car Sys. Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)).

explained, "[t]he question of whether a duty exists [under Michigan law] is a question of law." *Cleveland Indians Baseball Co., L.P. v. N.H. Ins. Co.*, 727 F.3d 633, 638 (6th Cir. 2013) (citing *Loweke*, 489 Mich 157). Where a defendant can show that he owed no duty to plaintiff, summary judgment is appropriate. *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 839 (6th Cir. 2013) (citing *Smith v. Kowalski*, 223 Mich. App. 610 (1997)). A common law duty of care is owed "to all of those whom the party knew or reasonably should have foreseen would by injured by the party's negligent acts or omissions." *Cleveland Indians Baseball Co.*, 727 F.3d at 638 (citations omitted).

Here, it is undisputed that the accident happened at Olympic Steel's Detroit facility. The Sixth Circuit has applied the rule articulated in *United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1953) to hold that a carrier such as McGhee, and not a buyer such as Cleaver-Brooks, is liable for injuries sustained during the loading and unloading of cargo. *Pierce v. Cub Cadet Corp.*, 875 F.2d 866 (6th Cir. 1989). More recently, this was explained by a court in this district applying *Savage* to a tort claim under Michigan law. *Johnston v. Sappi Fine Paper North Am.*, No. 06-11617, 2007 WL 1011914 (E.D. Mich. March 29, 2007) (Zatkoff, J.).

In *Johnston*, the plaintiff truck driver sued the defendant, a manufacturer of paper, after the plaintiff was injured loading a roll of papers weighing approximately 41,000 pounds to deliver to a third party. *Id.* at *1. After the paper was loaded on the plaintiff's truck, he departed the defendant's facility. *Id.* While plaintiff was on the highway, driving at a normal speed, the plaintiff felt the truck shake, and it began to tip. *Id.* The truck rolled over on the driver's side leaving the plaintiff severely injured. *Id.* In determining whether the defendant manufacturer owed the plaintiff a legal duty under Michigan law, the court cited the *Savage*

10

rule:

> The primary duty as to the safe loading of property is therefore upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

*Id.* at *2 (citing *Savage Truck Line*, 209 F.2d at 445).[12]

Under *Salvage* and *Johnston*, it is clear that McGhee himself had a duty to assure the steel coils were loaded safely. He was actively involved in loading the steel coils on the truck. *But see Lobdell v. Masterbrand Cabinets, Inc.*, No. 06-10948, 2008 WL 2224094, at *9 (E.D. Mich. May 29, 2008) (explaining that the truck driver "played no role in the loading" process). As explained in *Johnston*, in certain scenarios, the shipper owes the carrier a duty of care.[13] However, as the *buyer* of the steel coils, Cleaver-Brooks is far removed from the equation. Cleaver-Brooks cannot be held responsible for McGhee's injuries while loading the steel simply by allowing the steel to be shipped without racks. Cleaver-Brooks did not have a duty to McGhee during the loading process. Summary judgment is warranted on this basis alone.

### 3. Cleaver-Brooks was not a proximate cause of McGhee's injuries

Even if Cleaver-Brooks owed McGhee a duty of care, Cleaver-Brooks's action was not a proximate cause of McGhee's injuries. Under Michigan law, "[i]n order to establish causation, a plaintiff must prove two elements: (1) cause in fact and (2) proximate cause."

---

[12] *See Johnston*, 2007 WL 1011914, at *3 (explaining that the *Salvage* rule applies in claims brought under Michigan law).

[13] The Court does not make any finding as to whether Olympic Steel, the supplier, owed McGhee a duty of care; Olympic Steel is not a party to this case.

11

*Rupert v. Daggett*, 695 F.3d 417, 425 (6th Cir. 2012) (citing *Skinner v. Square D Co.*, 445 Mich. 153 (1994)). The Michigan Supreme Court has explained that proximate causation "involves examining the foreseeability of consequences. . . ." *Id.* at 425. Where a defendant's actions are "a foreseeable, natural, and probable cause," proximate causation exists. *Id.* However, "[i]f an intervening force is not reasonably foreseeable under an objective standard, it constitutes a 'superceding cause' which relieves a prior negligent defendant from liability.' " *Id.* at 426 (citation omitted).

While proximate cause is normally an issue resolved by a jury, a court may decide the issue as a matter of law if reasonable minds could not disagree on the resolution of the issue. *Nichols v. Dobler*, 253 Mich. App. 530 (2002).

Here, as explained above, Cleaver-Brooks concedes for purposes of summary judgment that it agreed to allow the steel coils to be shipped without racks subject to the "PDF" instructions. It is undisputed that the instructions were not followed by the crane operator. In addition, McGhee made a conscious decision not to chain the bundles of coil to the truck while they were being loaded. He testified at his deposition that he did not take this action because he did not believe that the steel coils would tip over.

As such, even if Cleaver-Brooks owed McGhee a legal duty while he was helping to load the steel coils at Olympic Steel's Detroit facility, the crane operator's failure to follow the "PDF" instructions when loading the steel coils without racks, as well as McGhee's decision not to use a chain when the coils were loaded onto his truck, is a superceding cause relieving Cleaver-Brooks of any liability. The Michigan Supreme Court has explained that in order to be a superceding cause, more than ordinary negligence is required. *People v. Feezel*, 486 Mich. 184, 195 (2010). "Gross negligence" or "intentional misconduct,"

12

defined as "wantonness and disregard of the consequences which may ensue" is enough to break the causal chain. *Id.* Wantonness is defined as "[c]onduct indicating that the actor is aware of the risks but indifferent to the results and usually suggests a greater degree of culpability than recklessness." *Id.* (citation and internal quotation marks omitted).

Here, there are multiple superceding causes that break any causal chain that leads to a finding of negligence on behalf of Cleaver-Brooks. First, Kelesovski testified at his deposition that he did not receive instructions from anyone at Olympic Steel on how to load the steel coils onto McGhee's truck. (Doc. 65-15 at 3). If this is true, Olympic Steel's failure to tell Kelesovski to follow the "PDF" instructions, which Olympic Steel knew would have to be followed for Cleaver-Brooks to accept delivery, was negligent. If this is not true, and Kelesovski was informed that the steel coils were required to be shipped according to the "PDF" instructions, he intentionally disregarded the directions with disregard to the consequences.[14]

Second, McGhee chose not to chain the steel coils as they were being loaded onto the truck. McGhee admitted at his deposition that if he thought there was a possibility that the coils could tip over, he would have chained them to the truck. (Doc. 71-1 at 6). McGhee also testified that he had been around steel where the banding broke on multiple

---

[14] Whether or not Kelesovksi was told to ship the steel coils according to the "PDF" instructions does not matter. Internal e-mail correspondence between Robert Steele ("Steele"), Olympic Steel's inside sales employee, and Terry Farmer ("Farmer") Olympic Steel's Senior Flat Rolled Product Specialist show that the steel coils should have been shipped according to the "PDF" instructions. In an e-mail sent by Steele to Farmer on May 18, 2009, Steele stated: "If we ship as a stand-up [without racks], [t]he attached shipping instructions *must be followed!* Load must be well tarped [sic]." (Doc. 83-3 at 2) (emphasis added). This e-mail shows that Olympic Steel knew the importance of following the "PDF" instructions.

occasions. As he testified at his deposition, "I've heard that sound a time or two. I would be afraid to say how many, but I've heard a band brake before." (*Id.* at 11). Despite his prior knowledge, McGhee disregarded the consequences of not chaining each bundle of steel. His actions are a superceding cause breaking the causal chain.

**B. Negligence – Hybrid Logistics**

**1. The Law**

The parties dispute whether McGhee's negligence claim against Hybrid is preempted by federal law. Courts are split on whether negligence claims against transportation brokers are preempted by federal law. *Compare Ameriswiss Tech., LLC v. Midway Line of Ill., Inc.*, 888 F. Supp. 2d 197, 204–208 (D.N.H. 2012) (holding that a negligence claim against a transportation broker is impliedly preempted by the Carmack Amendment to the Interstate Commerce Act, or, alternatively, expressly preempted under 42 U.S.C. 14501(b), (c)), *with Atlas Aerospace LLC v. Advanced Transp., Inc.*, No. 12-1200, 2013 WL 1767943, at *2–3 (D. Kan. April 24, 2013) (holding that the preemption under the Carmack Amendment only applies to claims against carriers, not brokers, and explaining that a majority of courts have disagreed with the reasoning in *Ameriswiss*). The Court does not resolve this issue because even allowing McGhee to assert his claim under Michigan law, he fails to create a genuine issue of material fact that Hybrid was negligent.

**2. Hybrid Logistics did not owe McGhee a legal duty**

McGhee's negligence claim against Hybrid Logistics is even more attenuated than his claim against Cleaver-Brooks. Hybrid Logistics's only involvement in this case is that it is a party to a brokerage agreement, as explained above, with Black Warrior. The only role Hybrid Logistics played in this case is that it hired Black Warrior to deliver the steel

14

coils pursuant to the brokerage agreement. The agreement makes clear that Black Warrior, and by extension McGhee, was an independent contractor. Hybrid Logistics did not have a duty to ensure McGhee's safety during the process. See discussion of *Johnston, supra*, at 10–11.

### 3. Hybrid Logistics was not a proximate cause of McGhee's injuries

Like Cleaver-Brooks, Hybrid Logistics was not a proximate cause of McGhee's injuries. Even if Hybrid Logistics owed McGhee a duty, his argument that it was negligent in failing to warn him that the steel coils were to be delivered in a special manner–standing up without racks–has no merit. McGhee saw for himself that the steel was going to be loaded onto his truck standing up without any racks. However, he chose to continue; he allowed the crane operator to load the steel coils onto his truck. Accordingly, even if Hybrid Logistics had a duty to inform McGhee of the special nature of the load, McGhee's actions in continuing with the delivery after seeing for himself how the load was going to be loaded relieves Hybrid Logistics of responsibility.

### V. CONCLUSION

For the reasons stated above, Cleaver-Brooks's motion for summary judgment was granted and Hybrid Logistics's motion for summary judgment was granted. Because Cleaver-Brooks's motion for summary judgment was granted, its motion to quash is moot.

SO ORDERED.

   S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: April 4, 2014

15

12-10771 McGhee v. Hybrid Logistics, Inc.

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, April 4, 2014, by electronic and/or ordinary mail.

S/Sakne Chami
Case Manager, (313) 234-5160